(C.D. 4556)

STYLO MATCHMAKERS INTERNATIONAL, INC. *v.* UNITED STATES

Court No. 72-10-02117

(Decided August 27, 1974)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Irving Levine* of counsel) for the plaintiff.

*Carla A. Hills*, Assistant Attorney General (*Frank J. Desiderio*, trial attorney), for the defendant.

*Lamb & Lerch* (*David A. Golden*), for amicus curiae.

RICHARDSON, Judge: The merchandise in this action consists of polyvinyl chloride injection molded (one continuous piece of mate-

rial) golf shoes manufactured in and exported from England, and entered at Boston on December 7, 1970. They are described on the commercial invoice as "style PP30 Mens black/white waterproof super greensneaker."

The shoes were classified in liquidation under TSUS item 700.53 at the duty rate of 37.5 percent ad valorem. Item 700.53, with its superior heading, reads as follows:

> Footwear (whether or not described elsewhere in this subpart) which is over 50 percent by weight of rubber or plastics or over 50 percent by weight of fibers and rubber or plastics with at least 10 percent by weight being rubber or plastics:
>> Hunting boots, galoshes, rainwear, and *other footwear designed to be worn* over, or *in lieu of, other footwear as a protection against water*, oil, grease, or chemicals or cold *or inclement weather*, all the foregoing having soles and uppers of which over 90 percent of the exterior surface area is rubber or plastics (except footwear with uppers of nonmolded construction formed by sewing the parts thereof together and having exposed on the outer surface a substantial portion of functional stitching) : [Emphasis supplied.]
>>> \* \* \* \* \* \* \*

700.53          Other _____37.5% ad val.

Plaintiff claims the merchandise is properly dutiable under TSUS item 700.55 as modified by T.D. 68–9, at the duty rate of 8.5 percent ad valorem. Item 700.55, with its superior heading, reads as follows:

> Other footwear (except footwear having uppers of which over 50 percent of the exterior surface area is leather):

700.55 >> Having uppers of which over 90 percent of the exterior surface area is rubber or plastics (*except footwear* having foxing or a foxing-like band applied or *molded at* the sole and overlapping the upper) \_\_\_8.5% ad val. [Emphasis supplied.]

The domestic interest was represented by Rubber Manufacturers Association through its counsel as amicus curiae.

All parties concede that the issue is whether or not the imported footwear is "footwear designed to be worn . . . in lieu of, other footwear as a protection against water . . . or cold or inclement weather . . . ."

The plaintiff produced two witnesses and introduced ten exhibits into evidence. The defendant produced six witnesses and introduced six exhibits into evidence.

The plaintiff's first witness, Ross L. Humphrey, director of public relations for the plaintiff, Stylo Matchmakers International, Inc., testified that he placed orders for shoes with Stylo Matchmakers International Limited in England, accepted the orders of shoes, handled orders from his company's clients—professional golfers and retail stores—and represented his company at trade fairs and trade meetings. He stated that the business of his company, which had been in operation for three years, was to import and distribute Stylo Matchmakers' golf shoes in all states except Alaska and Hawaii. A black and white, injection molded, guaranteed waterproof, golf shoe, with eleven metal spikes placed on each shoe and a kiltie over the eyelets, which is representative of the imported merchandise, was received in evidence as plaintiff's exhibit 1. Other exhibits introduced through Humphrey were exhibit 2, a collection of invoices of exhibit 1 golf shoes shipped to professional golfers by the plaintiff; exhibit 3, a brochure illustrating exhibit 1, the golf shoe in issue; exhibit 4, a price list that accompanied the brochure; exhibit 5, an advertisement of the shoe in issue; exhibit 6, a galosh; exhibits 7 and 8, two types of golf rubbers— one with metal spikes and one with rubber tips in place of spikes, which are worn over regular street shoes.

Humphrey stated that he had worn golf shoes like exhibit 1 in all types of weather. He admitted his feet would sweat more in exhibit 1 than in a leather golf shoe because the waterproof shoe would prevent perspiration from penetrating to the outside, but the shoe would not be uncomfortable.

Plaintiff's second witness, Richard E. Eagan, an insurance man, testified that he has been playing golf for 35 years, and has been wearing exhibit 1 in wet and dry weather since April 1973. He said that you only have to have one pair of golf shoes when you have exhibit 1.

Defendant's exhibit A is a letter to golf professionals from Stylo Matchmakers International which refers to a style like exhibit 1 as "guaranteed waterproof" which has been proven "in more than four years of usage on the wet British courses."

The defendant's first witness, Frank M. LeCompte, vice-president in charge of engineering of Tingley Rubber Corporation, explained

that the pull-over golf rubbers illustrated in exhibits 7 and 8 are made by the compression molding process which he said is similar to the injection molding process used in manufacturing in exhibit 1. He also identified a flier, exhibit B, which his company encloses with exhibit 7 explaining how useful the rubber is on a soggy turf; and exhibit C an advertisement of exhibit 7 which appears in a trade magazine.

The defendant's second witness, Arthur M. Bell, vice-president of Foot-Joy Incorporated for sales and marketing golf shoes to professional accounts, identified exhibit D, a rubber, waterproof golf shoe made in England and sold by Foot-Joy to be worn in wet weather or when the ground has heavy dew on it. He compared it to exhibit 1 and stated that both are wet weather golf shoes and he would not recommend either one for hot or fair weather as they do not breathe or allow air to circulate within the inside. He also identified exhibit E, a Goodyear welt leather golf shoe which is not waterproof.

Defendant's third witness, Philip G. Brown, assistant to the divisional president of the Consumer Products Division of Uniroyal Incorporated, is a chemist who has been concerned with product development and control for 36 years. He described exhibit 1 as "an injection molded shoe of some synthetic material as opposed to rubber," and exhibit D as "not an injection molded shoe," but made of several pieces of vulcanized rubber into one piece. Both exhibits 1 and D are chemically bonded, making them waterproof. On cross-examination Mr. Brown identified exhibit 9 which is a Uniroyal catalogue showing that leather and polyvinyl chloride golf shoes were both marketed as waterproof golf shoes by Uniroyal. He stated that laboratory tests had established that vinyl material was hotter than leather and does not pass moisture through itself as does leather.

Defendant's fourth witness, Ralph H. LaCroix, national sales and commodity manager for the Golf Division of Uniroyal Incorporated, said that Uniroyal withdrew the advertised waterproof golf shoe in March 1973, because the shoe failed and was not in fact waterproof. He said his company could not get good adhesion between upper leather and the sole, and with use the protective coating that was processed into it lost its effectiveness, and water leaked through the leather. According to his experience on golf courses as a participant in tournaments he said he observed the average golfer has between four and five pairs of shoes. An average golfer was described as one who plays once a week or more.

Defendant's fifth witness, Harold Berk, president of Songo Shoe Manufacturing Corporation, appeared pursuant to a subpoena. He testified that his company manufactures street and golf shoes, including a waterproof shoe, exhibit F, shown also in an advertisement sheet, exhibit 10. He described exhibit 1 as a replacement of a rubber, and that his company's golf shoe, exhibit F, is manufactured as a

replacement of a leather shoe. The bottom of exhibit F is clear vinyl, injection molded, and the upper is a calendered polyvinyl chloride injection molded to the bottom. It does not breathe, and is sold as a regular golf shoe.

Defendant's sixth witness, John Neville, Jr., assistant pro to George Lane at a golf club, and a member of the Professional Golfers' Association of America, said he sold shoes such as exhibit 1 in his pro shop as "a second shoe or a water shoe." He also said the average member of his golf club had an average of three or four pairs of shoes, one of which would probably be a water or protective shoe.

From the testimony of all of the witnesses for both plaintiff and defendant exhibit 1 is "a type of golf shoe." This conclusion, however, does not resolve the controversy, and a comparative analysis of the wording of the two competing tariff items—700.53 and 700.55—and their legislative history is required for an understanding of Congressional intent. Both tariff items refer to "other footwear" of "rubber or plastics."

Item 700.53 embraces "other footwear" (*whether or not described elsewhere in this subpart*) which is over 50 percent by weight of rubber or plastics." [Emphasis supplied.] Exhibit 1 is made of a composition which may be described broadly as over 50 percent by weight of plastics and could be classified under item 700.53 according to this standard. Item 700.55 also embraces "other footwear" which has "uppers of which over 90 percent of the exterior surface area is . . . plastic." Without more it might well be argued that exhibit 1 should likewise be classified under item 700.55. To say only that the language "whether or not described elsewhere in this subpart" following other "footwear" in item 700.53 negates the possibility of classifying any "other footwear" under any other item in subpart A would render the use of the term in item 700.55 meaningless. This makes imperative a reference to the legislative history to ascertain to which of the two "other footwear" tariff items exhibit 1 should be assigned.

The Report of the Tariff Commission in its Tariff Classification Study, to the Chairmen of the Committee on Ways and Means of the House and the Committee on Finance of the Senate with reference to schedule 7, part 1—"Footwear . . .," states that footwear made of "synthetic rubber as well as natural rubber and also of plastics" is embraced in 700.50 (now 700.53), and "A very large part of footwear covered by this item is commonly referred to as 'waterproof' footwear."[1] The exemplars of what is intended to be included are "Hunting boots, galoshes, rainwear, and other footwear designed to be worn over or in lieu of other footwear as a protection against water . . ."[2]

---

[1] Tariff Classification Study, Schedule 7, p. 23.
[2] *Ibid.*

It is stated on page 24 of the said report that " . . . item 700.55 would also include molded plastic shoes (*other than those of the so-called waterproof type provided for in item 700.50*" (now 700.53). [Emphasis supplied.] The underscored language seems to indicate an intention to exclude molded plastic shoes like exhibit 1 from item 700.55 and contain them in what is now item 700.53.

Also, page 25 of the said report indicates that " 'waterproof' footwear provided for in item 700.50" (now 700.53) is separated from the "non-waterproof" footwear provided "in item 700.55."

Section 57 of Public Law 89–241 enacted October 7, 1965, in substituting item 700.53 for item 700.50, indicated that the "other" footwear covered in the item had reference to "protective footwear," and the legislative history indicates the object of the legislation is to cover "waterproof footwear" which competes with other such or similar footwear domestically produced.[3]

The plaintiff places much emphasis on its argument that the imported merchandise is not *ejusdem generis* with the enumerated exemplars—hunting boots, galoshes and rainwear. *Ejusdem generis* means literally "of the same kind." The imported merchandise must possess the particular characteristic which unites all of the exemplars in order to be classified in the item containing the exemplars. *Kotake Co., Ltd., American Customs Brokerage Co.* v. *United States*, 58 Cust. Ct. 196, C.D. 2934, 266 F. Supp. 385 (1967). The courts use *ejusdem generis* as a rule to aid them in interpreting the intention of the legislature.

The common characteristic in the exemplars is that they are waterproof or water repellent and are worn in wet weather or wet areas, usually for protection against water. Exhibit 1 is waterproof and there is testimony that it is more similar to exhibit D, a vulcanized waterproof rubber shoe with metal spikes, than exhibit E, a welt leather golf shoe which is not waterproof. The most persuasive testimony is that exhibit 1 is a water shoe or a shoe worn mostly in wet weather, though it may be worn infrequently in fair weather.

Both the weight of the evidence and the legislative history which reconciles any apparent conflict between the two competing tariff items support the classification of exhibit 1 as "other footwear" which is *waterproof*, "*designed to be worn . . . in lieu of, other footwear as a protection against water*" (whether rain or dew), when playing golf; rather than an ordinary or general purpose golf shoe worn for playing golf in all kinds of weather. Plaintiff has not overcome the presumption of correctness attached to the district director's classifi-

---

[3] The Tariff Schedules Technical Amendments Act of 1965, P.L. 89–241, 79 Stat. 933 (1965). See Senate Report No. 530, U.S. Code Congressional and Administrative News 1965, Vol. 2, p. 3416, at pp. 3434–3435.

84

cation finding that the imported merchandise is dutiable under item 700.53, and its claim is overruled.

Judgment will be entered accordingly.